John P. MAKUCH, Plaintiff,

v.

William A. HALTER, Acting Commissioner of Social Security Defendant

Civ. A. No. 01–10060–PBS.

United States District Court, D. Massachusetts.

Oct. 31, 2001.

Michael James Kelley, Boston, MA, for Plaintiff.

Anita Johnson, United States Attorney's Office, Boston, MA, for Defendant.

## *MEMORANDUM OF DECISION*

SARIS, District Judge.

### *INTRODUCTION*

Pursuant to 42 U.S.C. § 405(g), Plaintiff John Makuch, who suffered a back injury at work, seeks review of the decision denying his application for Social Security Disability Insurance Benefits. He argues: (1) that the Administrative Law Judge ("ALJ") violated the treating physician rule by disregarding the opinion of his treating physician; (2) that the ALJ improperly evaluated his subjective complaints of pain; and (3) that the ALJ improperly applied the grid because of his non-exertional impairment of pain. For the reasons stated below, the Court *DENIES* defendant's motion to affirm the decision of the Commissioner and *ALLOWS* plaintiff's motion to remand.

### *FACTS*

The administrative record contains the following facts. Claimant John Makuch is a forty-two year old married man with a 12th grade education. For seventeen years, he worked as a first class utility man for the New England Power Service Company. (Tr. 31.) Makuch first injured his back in a work-related accident on August 19, 1998, when he tried to pick up a heavy valve. Working the rest of the week, he then re-injured his back at work on August 27, 1998. Medical director Dr. Charles Lutton, who treated Makuch that day, reported to Makuch's supervisor that Makuch complained of "pain in the midline of the back about L4 with minimal to no associated findings." (Tr. 211.)

On September 28, 1998, Makuch first saw his treating physician, Dr. James Leffers, for this injury. Leffers, a board certified orthopedic surgeon, identified "minor L5 disc narrowing" in an x-ray. He diagnosed low-back strain, and made a referral to a physical therapist. (Tr. 193.) Leffers prescribed Vicodin for Makuch's sleep problems, and told him to stay out of work. Subsequent treatment notes indicate substantial improvement, until claimant aggravated his injury by lifting a motorcycle on November 13, 1999. At that time Leffers believed that "therapy [is] going to work with him," but because of complaints of sciatica, ordered a magnetic resonance imaging exam ("MRI"). The MRI showed a minor disk herniation of L4–5 and a small focal bulge at L5/S1. (Tr. 194). Because plaintiff was not improving despite seventeen weeks of physical therapy, Leffers referred claimant to a neurologist, Dr. Ronald P. Hantman. Hantman performed a lumbar myelogram to determine the significance of the herniation. Based on a myelogram dated December 31, 1998, and a CT scan, Hantman reported a minimal bulging disc at L4–5 and S1, but added that the significance of this finding was questionable. (Tr. 197.)

Dr. Leffers continued to treat Makuch on approximately a monthly basis. On January 13, 1999, he recommended that Makuch restrict his personal weight training. (Tr. 198.) On February 5, 1999, Dr. Leffers completed a Physical Capacities Evaluation which indicated that Makuch could not sit, stand, or walk, although he occasionally could lift up to fifty pounds and carry up to twenty-five pounds. The evaluation stated that claimant could not crawl, climb or reach, and could bend and squat only occasionally. (Tr. 215.) Leffers next recommended that Makuch undergo epidural steroid injections, but Makuch reported a worsening of his symptoms after the injections. (Tr. 199.) Between March and September 1999, Leffers indicated no change in claimant's condition and continued to describe him as "disabled." (Tr. 200–210.)

On March 25, 1999, Makuch underwent an electromyograph ("EMG") recommended by Dr. Hantman. Dr. Andrew Mazur, who performed the EMG, reported that the physical exam showed Makuch had a normal gait, was able to heel/toe walk without difficulty, and did not show signs of muscle atrophy or asymmetry. He also noted "significant tenderness" in the lumbar spine. Dr. Mazur reported "essentially normal" EMG findings, and recommended physical therapy to improve strength, flexibility and conditioning. (Tr. 152; 153.)

In connection with his Worker's Compensation claim, at the request of the state's insurance carrier, Makuch was examined by orthopedic surgeon Dr. Gilbert Shapiro, on April 6, 1999. Makuch complained to Shapiro that he couldn't sleep because of the pain. Shapiro conducted a physical exam and reviewed the records of Makuch's treatment up to that date. Shapiro diagnosed "acute lumbosacral strain on a pre-existing degenerative lumbar disc disease at multiple levels." (Tr. 158.) He reported degenerative spinal changes that render Makuch "partially disabled." *Id.* Shapiro stated that Makuch, "can certainly work in a seated position with full use of his upper extremities without difficulty. He can stand and walk and do some climbing, but bending and lifting beyond 40 lbs. would be limited and he would be limited as to activities and awkward positions." (Tr. 158.) Shapiro noted that Makuch had attended approximately 60 physical therapy treatments, with little or no improvement. Pointing out that Makuch had reached an end result, Dr. Shapiro recommended light-duty work with lifting limited to about 40 pounds. (Tr. 156–58.)

On April 7, 1999, Dr. Leffers reported that Makuch's mid back and upper lumbar region discomfort was no better and prescribed Percocet and a back brace. He reported that Makuch suffered episodes of sharp disabling pain and was unfit for standing or seated work. On May 20, 1999, Dr. Leffers reported to defendant's medical examiners that Makuch was unfit for productive work on a part time or full time basis for the near future. On November 10, 1999, Dr. Leffers again x-rayed claimant's spine. He stated that Makuch may suffer from some L5 disc disease, and suggested a discogram. Subsequent notations indicate no improvement in claimant's complaints of chronic, low back pain. (Tr. 210.) Leffers continued to prescribe Vicodin and Flexeril.

On July 12, 1999, Makuch underwent a physiatric [1] exam by Dr. Joseph J. Doerr, on referral from Dr. Leffers. The physical exam revealed "good strength and functional range of motion at all distal pivots...moderate restriction around bilateral hips...severe restriction in lumbar movements in all directions...[and] some restriction in upper back with bending, twisting, etc." His final assessment indicated "chronic mechanical low back pain, probable myofascial pain with contracture from a work related incident on 08–14–98." He recommended that Makuch attempt a return to physical therapy. (Tr. 213, 214.)

Also on July 12, the same day as Dr. Doerr's exam, Leffers provided claimant with a "Medical Assessment of Ability to do Work Related Activities." Dr. Leffers' assessment stated that chronic low-back pain severely limited claimant in his activities. According to Leffers, Makuch possessed very little capacity to sit, walk, stand, lift or carry, reach, push and pull, or

---

1. A physiatrist is a physician specializing in physical medicine and rehabilitation and certified by the American Board of Physical Medicine and Rehabilitation. *Mosby's Medical Dictionary,* 1261 (5th Ed.1998).

handle. When asked how many hours Makuch could stand, walk or sit, he said "can't determine, very little." Leffers further indicated that Makuch could not climb, balance, stoop, crouch, kneel, or crawl. (Tr. 203, 204.)

Leffers' notes dated September 22, 1999, indicate that Makuch injured his hand lowering his motorcycle. The same entry states that "his disability is total and remains unchanged." (Tr. 210.) Also on that date, Leffers completed a second Physical Capacities Evaluation for Makuch. The evaluation indicated that Makuch could not sit, walk or stand for even an hour over the course of an eight hour work day. (Tr. 216.)

In connection with claimant's Social Security application, two non-examining medical consultants conducted residual functional capacity assessments ("RFCs") on behalf of the SSA. Dr. David Weintraub completed the first assessment on May 5, 1999. Weintraub concluded that Makuch retained the following capacities: occasional lifting of twenty pounds and frequent lifting of ten pounds, standing for six out of eight working hours, sitting for six out of eight working hours, and unlimited pushing/pulling. (Tr. 176–83.) The second assessment, conducted six weeks later by Dr. Mark Colb, indicates that Makuch could lift fifty pounds occasionally and twenty-five pounds frequently. (Tr. 185–92.)

A third non-examining physician retained by the SSA, Dr. Louis Fuchs, provided the only physician testimony at the disability proceeding. Dr. Fuchs, an orthopedic surgeon, testified as to the diagnostic testing Makuch underwent, and its results. He opined that the "small amount of pathology that these tests show normally would not be productive of huge pain." (Tr. 47.)

Vocational expert Paul Murgo, retained by the SSA, testified that Makuch possessed no transferrable skills. The ALJ posed a hypothetical question to Murgo based on Dr. Shapiro's findings. The vocational expert concluded that a claimant with the limitations described by Shapiro has the capacity to engage in the full range of light and sedentary work. The ALJ's question to the vocational expert did not incorporate claimant's allegations of pain as a possible non-exertional limitation. (Tr. 48–52.)

### SOCIAL SECURITY APPLICATION

Claimant John Makuch filed an application for Social Security Disability Income Benefits ("SSDI") on March 12, 1999. Makuch claimed that he had been disabled since August 27, 1998 due to discogenic and degenerative disorders of the back. The Social Security Administration ("SSA") denied claimant's initial application on May 14, 1999, and again upon reconsideration on June 24, 1999. (Tr. 55, 62.)

A hearing was held on March 7, 2000, before an ALJ. Makuch was represented at this proceeding by a non-attorney advocate. (Tr. 18.) The ALL based his March 14, 2000, determination that claimant is not disabled on a finding of residual capacity for the full range of light and sedentary work. (Tr. 25.) The SSA Appeals Council denied claimant's request for review on November 17, 2000, rendering the ALJ decision the final decision of the SSA Commissioner. (Tr. 7.) This civil action was commenced on January 12, 2001.

### DISCUSSION

#### A. Disability Determination Process

The Commissioner has developed a five step sequential evaluation process to determine whether a person is disabled. See

20 C.F.R. § 404.1520; *Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6–7 (1st Cir.1982). "Step one determines whether the claimant is engaged in substantial gainful activity. If he [or she] is, disability benefits are denied. If he [or she] is not, the decision-maker proceeds to step two, which determines whether the claimant has a medically severe impairment or combination of impairments." *Bowen v. Yuckert*, 482 U.S. 137, 140–41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (citations and quotations omitted). The severity regulation requires the claimant to show that he or she has an " 'impairment or combination of impairments which significantly limits . . .' 'the abilities and aptitudes necessary to do most jobs.' " *Bowen*, 482 U.S. at 146, 107 S.Ct. 2287 (quoting 20 C.F.R. §§ 404.1520(c), 404.1521(b)).

If the ALJ determines that the claimant has a severe impairment, the third step requires a determination as to whether that impairment, or set of impairments,

> is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.

*Id.* at 141–42, 107 S.Ct. 2287 (citations omitted).

However, if the impairment is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step. At the fourth step, the ALJ must determine whether the claimant is prevented by the impairment from performing his previous occupation. If the claimant is able to perform his previous work, he is not disabled. However, a finding that claimant cannot perform his previous work requires that the ALJ continue to the fifth and final step. *Id.*

Throughout most of the five-step disability determination process, the burden of proof is on the claimant. *See id.* at 146 n. 5, 107 S.Ct. 2287. At the fifth step, however, the burden shifts to the Commissioner: he must provide substantial evidence that the claimant is able to perform work in the national economy. If he is not able to perform other available work, claimant is entitled to disability benefits. *Id.* at 141–42, 107 S.Ct. 2287.

At steps one and two, the ALJ found that Makuch was not engaged in substantial gainful activity, and that his combination of impairments reached the level of "severe." However, the ALJ found Makuch's impairment not *per se* disabling at step three. The inquiry therefore proceeded to step four, where the ALJ found Makuch no longer able to perform his previous employment. Makuch's application proceeded to step five, where it failed because the ALJ found him capable of the full range of light and sedentary work. (Tr. 23–25.)

## B. STANDARD OF REVIEW

■ Judicial review of SSI determinations is available pursuant to 42 U.S.C. § 405(g), which provides, in part, that:

> Any individual, after any final decision of the Commissioner made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision. . . . The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing. The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. . . .

In reviewing such decisions, district courts do not make *de novo* determinations. *Lizotte v. Sec'y of Health & Human Servs.*, 654 F.2d 127, 128 (1st Cir.1981). Instead, this Court "must affirm the [Commissioner's] findings if they are supported by substantial evidence." *Cashman v. Shalala*, 817 F.Supp. 217, 220 (D.Mass.1993); *see also Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir.1987) (stating that the Commissioner's determination must be affirmed, "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence"), *cert. denied*, 484 U.S. 1012, 108 S.Ct. 713, 98 L.Ed.2d 663 (1988).

Substantial evidence is evidence that amounts to "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. Nat'l Labor Rel. Bd.*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *see also Cashman*, 817 F.Supp. at 220–21. In reviewing the record for substantial evidence, "[i]ssues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the [Commissioner]." *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir.1981) (quoting *Rodriguez v. Celebrezze*, 349 F.2d 494, 496 (1st Cir.1965)). When there is a conflict in the record, the Commissioner has the duty to weigh the evidence and resolve material conflicts in testimony. *See Richardson*, 402 U.S. at 399, 91 S.Ct. 1420; *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir.1991).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must consider whether the proper legal standard was applied. *Jackson v. Bowen*, Civ. A. No. 82–2272–Z, 1987 WL 9772, at *2 (D.Mass. Mar.12, 1987). "Failure of the [Commissioner] to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with the sufficient basis to determine that the [Commissioner] applied the correct legal standards are grounds for reversal." *Weiler v. Shalala*, 922 F.Supp. 689, 694 (D.Mass.1996) (citing *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982)).

## C. THE TREATING PHYSICIAN RULE

Mr. Makuch argues that the ALJ erred in his decision to assign "no probative value" to the opinion of his treating physician, Dr. Leffers. (Tr. 23) The ALJ found:

It is clear from the record that he [bases] these limitations solely on the subjective complaints of the claimant. Dr. Leffers fails to provide any significant objective clinical findings in his treatment notes to support the limitations he alleges. Moreover his limitations are inconsistent with the vast preponderance of other objective and clinical findings provided by other physicians and which are contained in the record.

(Tr. 23.)

Under the regulations, an ALJ is required to give more weight to the treating physician's opinion "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of the patient's medical condition. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). However, the ALJ is "not obligated automatically to accept [the treating physician's] conclusions." *Guyton v. Apfel*, 20 F.Supp.2d 156, 167 (D.Mass. 1998). Controlling weight is given only if the "treating source's opinion on the issue(s) of the nature and severity of [the

patient's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Furthermore, the ultimate determination of disability is left to the ALJ, not the various medical sources. *See* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).

■ In determining the weight to be given to a treating physician's report, the ALJ must consider six enumerated factors: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the relevant evidence in support of the medical opinion; 4) the consistency of the medical opinions reflected in the record as a whole; 5) whether the medical provider is a specialist in the area in which he renders his opinions; and 6) other factors which tend to support or contradict the opinion.

*Guyton*, 20 F.Supp.2d at 167 (citing 20 C.F.R. § 404.1527(d)(2)). The regulations do "not mandate assignment of some unvarying weight to every report in every case." *Id.* (citation omitted). However, the ALJ must give "good reasons" for the weight given to the treating physician's opinions. *See* 20 C.F.R. § 416.927(d)(2).

■ Plaintiff argues that these factors favor giving controlling weight to Dr. Leffers' RFC assessment. First, as to the nature, length of the relationship, and frequency of examination, the record supplies evidence that Dr. Leffers saw claimant on a monthly basis from approximately one month before the accident in July 1998 to just before the hearing before the ALJ in March 2000. In this span of nineteen months, Dr. Leffers' treatment notes well document Plaintiff's course of treatment. Second, as to the level of expertise, the record shows that Dr. Leffers, a board

certified orthopedist, was a specialist with the relevant expertise to evaluate Makuch's back impairment.

Defendant contends that the factors weigh in favor of the ALJ's decision to give Dr. Leffers' opinion no weight at all. Dr. Leffers declined to provide any explanation at all as to why he opined that Makuch could stand or sit zero hours in a day. His terse statement in the explanation section of the RFC assessment, "can't determine very little," hardly provides support for such a dramatic conclusion. Moreover, Dr. Leffers' finding is inconsistent with Makuch's own testimony that he did the laundry, light housekeeping, took daily ½ hour walks and drove his children to school.

Most significantly, Dr. Leffers' opinion that claimant retained no capacity for work conflicts with the opinions of the other physicians consulted: Dr. Shapiro, who examined claimant in relation to his Workman's Compensation claim; and the two non-examining physicians who completed RFCs for the SSA. Dr. Leffers' assessment of Makuch's capacity for work also conflicts with the opinion of Dr. Doerr, the physiatrist to whom Dr. Leffers referred Makuch. Although the two assessments were completed on the same day, Doerr offers a much more optimistic view of Makuch's abilities. Leffers' report indicates restrictions on virtually any activity. He reports very little capacity to lift, stand, or walk, and no ability to climb, balance, stoop, crouch, kneel, or crawl. Doerr's major finding is severe restriction of lumbar movement in all directions due to pain, for which he recommended physical therapy. Finally, as Dr. Fuchs pointed out, the objective medical evidence of minimal bulging of the L4–5 disc did not support the extreme work limitations in Dr. Leffers report.

Although Dr. Leffers was a treating physician, the ALJ is not held hostage to his bottom line assessment in the RFC because it is so out-of-sync with the objective medical testimony, the assessments of other doctors and claimant's own testimony regarding his lifestyle.

## D. COMPLAINTS OF PAIN.

As is often the case, the more difficult issue involves plaintiff's subjective complaints of pain. Although he found that claimant suffered from a severe impairment, "back pain due to degenerative disc disease" (Tr. 25), the ALJ found that the plaintiff's testimony concerning his limitations due to pain were not "totally" credible.

▬▬▬ In evaluating subjective complaints of pain, the ALJ must first determine whether there is a "clinically determinable medical impairment that can reasonably be expected to produce the pain alleged." *Avery v. Secretary of Health and Human Serv.*, 797 F.2d 19, 21 (1st Cir.1986). When evaluating the clinical evidence, the ALJ should also consider "other evidence including statements of the claimant or his doctor, consistent with the medical findings." *Id.* However, "[t]his does not mean that *any* statements of subjective pain go into the weighing." *Id.* (emphasis in original). The ALJ, in resolving conflicts of evidence, may determine that the claimant's subjective complaints concerning his condition "are not consistent with objective medical findings of record", if the ALJ's determination is supported by evidence in the record. *Evangelista v. Secretary of Health and Human Serv.*, 826 F.2d 136, 141 (1st Cir.1987).

With this evidence in hand, the Agency is required to "evaluate the intensity and persistence of [the claimant's] symptoms so that [it] can determine how [the] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c). The regulations recognize that a person's symptoms may be more severe than the objective medical evidence suggests. *See* 20 C.F.R. § 404.1529(c)(3). Therefore, the regulations provide six factors (known as the *Avery* factors) that will be considered when an applicant alleges pain.

Considerations capable of substantiating subjective complaints of pain include evidence of (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness and side effects of any medication taken to alleviate the pain or other symptoms; (5) treatment, other than medications, received to relieve pain or other symptoms; and (6) any other factors relating to claimant's functional limitations and restrictions due to pain.

*Adie v. Commissioner, Soc. Sec. Admin.*, 941 F.Supp. 261, 269 (D.N.H.1996) (citing 20 C.F.R. § 404.1529(c)(3); *Avery*, 797 F.2d at 23).

▬▬▬ The ALJ's credibility determination "is entitled to deference, especially when supported by specific findings." *Frustaglia v. Secretary of Health and Human Serv.*, 829 F.2d 192, 195 (1st Cir.1987) (citations omitted). However, an ALJ who does not believe a claimant's testimony regarding his pain, "must make specific findings as to the relevant evidence he considered in determining to disbelieve the [claimant]." *Da Rosa v. Secretary of Health and Human Serv.*, 803 F.2d 24, 26 (1st Cir.1986). *See also* Social Security Ruling (SSR) 96–7p, Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 61 Fed.Reg. 34,483, 34,485–86 (1996) (requiring that "[w]hen evaluating the credibility of an individual's statements, the ad-

judicator must . . . give specific reasons for the weight given to the individual's statements"; and "the reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.").

In determining the severity of a claimant's pain, "the absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms *is only one factor* that the adjudicator must consider in assessing an individual's credibility." SSR 96–7p, 61 Fed.Reg. at 34,487 (emphasis added). *See also Gordils v. Secretary of Health and Human Serv.,* 921 F.2d 327, 330 (1st Cir.1990) (upholding denial of benefits where ALJ described claimant's daily activities as "practically intact" and evaluated her demeanor at the hearing in addition to objective medical evidence); *Berrios Lopez v. Secretary of Health and Human Serv.,* 951 F.2d 427 (1st Cir.1991) (upholding ALJ's evaluation discrediting claimant's pain where the ALJ noted observations of claimant at the hearing (i.e., that she walked without assistance and drove to the hearing) and where claimant also performed household chores).

The overwhelming undisputed evidence in this record indicates that plaintiff was suffering from lower back pain due to degenerative disc disease, although there is a fair debate over the degree of pain. On the Leffers end of the spectrum, claimant's pain was so severe as to be totally disabling. Other doctors took a more moderate position. Dr. Gilbert Shapiro, the doctor for the insurance company, concluded that Makuch suffered from "acute lumbosacral strain on a pre-existing lumbar disc disease at multiple levels" which rendered him "partially disabled." (Tr. 58) Dr. Joseph J. Doerr, the physiatrist, reported severe restriction in lumbar movements in all directions and concluded that claimant had "chronic mechanical lower back pain, probable myofascial pain with contracture." (Tr. 213–214) On the other side of the spectrum, Dr. Fuchs testified that the "small amount of pathology that these tests show normally would not be productive of huge pain." Thus, while the doctors vary on their assessment of the degree of pain, none discredits plaintiff's claim that he had pain.

Claimant persistently pursued cures for his pain: multiple physical therapy sessions, epidural injections, aquatic therapy, a TENS unit, a back brace and the prescription of muscle relaxants like Vicodin which he sometimes took four times per day, and two at night. He saw multiple doctors and took many tests in search of a remedy. As Dr. Fuchs said, the care Makuch received ran the "gamut of conservative treatments." (Tr. 45.)

To be sure, Makuch did not always act wisely after his back injury at work. Most significantly, he continued to weight lift until January 1999 (four months after the initial work injury) when his doctor told him to stop, and tried to lift his motorcycle in November 1998 and again in September 1999. Nonetheless, at the hearing he testified that he had been forced to give up biking, rollerblading, weight lifting and most physical activity except a half hour daily walk, light housekeeping, the laundry, and driving his children to school. He once took his children to the amusement park but stayed in the van.

The ALJ could fairly determine that Makuch exaggerated the degree of pain based on Dr. Fuch's testimony, the objective medical tests, the reports of the other doctors, and Mr. Makuch's lifestyle, including his daily constitutional, his van driving, and his occasional toying with his motorcycle. However, the record provides substantial evidence that plaintiff was suffer-

ing from significant pain. Although the ALJ found that claimant was not totally credible on the limitations created by the pain, the opinion was vague as to what non-exertional limitations the pain placed on plaintiff's ability to work.

### E. USE OF THE "GRIDS"

■ Makuch asserts that the ALJ erred in using the Grids to meet the SSA's burden of proving the availability of appropriate jobs because the Grids cannot take into account his claims of pain[2]. At the fifth stage of the disability determination process, the burden shifts to the SSA to establish that jobs within the claimant's functional capacity exist in the national economy. *Heggarty v. Sullivan,* 947 F.2d 990, 995 (1st Cir.1991). Where a claimant has only strength-related, or "exertional," limitations, the ALJ can use the Medical–Vocational Rules, 20 C.F.R. § 404, Subpt. P, App. 2 (the "Grids") to satisfy this requirement. Where a claimant suffers from a non-exertional impairment that significantly affects his ability to work, however, the ALJ may not be able to rely on the Grids to carry the burden of proving the existence of available jobs in the claimant's range of functioning; if a significant non-exertional impairment more than marginally erodes the occupational base, the testimony of a vocational expert is required to establish that a sufficient number of jobs are available that the claimant can perform in spite of his limitations. *Heggarty,* 947 F.2d at 996 (citing *Ortiz v. Secy. of Health & Human Services,* 890 F.2d 520, 524 (1st Cir.1989)).

Makuch claims that the pain he suffers as a result of his disc problems constitutes a non-exertional limitation that significantly affects his ability to work within the

sedentary and light occupational categories. Pain can create exertional, non-exertional, or a combination of impairments. 20 C.F.R. § 404.1569a(b)-(d). "Limitations are classified as exertional if they affect your ability to meet the strength demands of jobs." § 404.1569a(a). When a limitation imposed by the impairment and related symptoms, like pain, affect only the ability to meet the strength demands of jobs, a claimant has only "exertional" impairments, and the Grid is applicable. § 404.1569a(b). However, pain can also be a limitation affecting only non-exertional limitations of the job(i.e., difficulty paying attention). *See* § 1569a(c). In that case, the Grid does not apply. *Id.* Additionally, if pain results in a combination of exertional and non-exertional impairments, the Grid alone cannot determine the outcome. *Id.*

It follows from the above restrictions on the use of the Grids that the ALJ must make a specific finding as to the type and extent of the limitation created by the pain so that the reviewing court can determine whether or not the use of the Grid was error. *See Gagnon v. Sec'y of Health and Human Services,* 666 F.2d 662, 666 (1st Cir.1981) (remanding case for specific finding as to extent of non-exertional limitations and possible testimony of vocational expert.) The ALJ found only that Makuch's "...back pain due to degenerative disc disease is a severe impairment...", leaving in question the type(s) of restrictions caused by the pain. (Tr. 25.)

Although the ALJ received testimony from a vocational expert, his testimony was quite truncated. The expert was not asked whether work is available for someone with Makuch's alleged combination of

---

**2.** Claimant's brief now alleges fatigue as an additional non-exertional impairment. Fatigue was not included in his disability appli-

cation or at the hearing, and is not mentioned in the medical records.

exertional and non-exertional limitations. (Tr. 48–52.) The ALJ's failure to make a specific finding as to whether or not Makuch's impairment created a significant non-exertional limitation is cause to remand because it makes it impossible for this court to determine whether or not the ALJ was required to consult the vocational expert about those limitations before making his final disability determination.

### ORDER

Defendant's motion for order affirming the decision of the Commissioner is **DENIED**. Plaintiff's motion for remand is **ALLOWED**.